# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**UNITED STATES OF AMERICA**
      **Plaintiff,**

    **v.**                              **Case No. 11-CR-4**

**HENRY TYLER**
            **Defendant.**

---

## SENTENCING MEMORANDUM

Defendant Henry Tyler, the founder of a private school that participated in Milwaukee's school choice program, pleaded guilty to mail fraud, 18 U.S.C. § 1341, and money laundering, 18 U.S.C. § 1957, arising out of his execution of a scheme to defraud the national school lunch and breakfast programs. The scheme involved defendant's inflation of the number of students the school fed pursuant to the programs and his continued submission of reimbursement requests even after the school closed.

At his sentencing hearing, defendant requested probation, while the government argued that some prison time was necessary. This memorandum sets forth written reasons for the sentence imposed.

## I. GUIDELINES

The first step in sentencing a defendant is to correctly calculate the applicable guideline range. See Gall v. United States, 552 U.S. 38, 49 (2007); United States v. Vrdolyak, 593 F.3d 676, 678 (7th Cir.), cert. denied, 131 S. Ct. 200 (2010). In the present case, without objection defendant's pre-sentence report ("PSR") set an offense level of 21 on the mail fraud count: base level 7, U.S.S.G. § 2B1.1(a)(1), plus 10 levels based on the loss amount, §

2B1.1(b)(1)(F), plus 2 levels because defendant purported to act on behalf of an educational organization, § 2B1.1(b)(8)(A), and plus 2 levels because defendant managed or supervised another person (i.e., a school employee) in the commission of the offense, § 3B1.1(c).  On the money laundering count, the PSR, again without objection, set a base level of 7 under U.S.S.G. § 2S1.1(a)(1), plugging in the base level from the mail fraud count, then added 2 levels under § 2S1.1(b)(2) because defendant was convicted under 18 U.S.C. § 1957.  The PSR then grouped the two counts pursuant to 3D1.2(b) and subtracted 3 levels for acceptance of responsibility, for a final level of 18.

Prior to sentencing, I advised the parties of a potential error in the PSR's calculations.  As indicated, the PSR set a base offense level of 7 on the money laundering count under U.S.S.G. § 2S1.1(a)(1) by employing the base level for the underlying offense, i.e. mail fraud. (PSR ¶ 72.)  However, when the money laundering base level is determined under § 2S1.1(a)(1), the court applies "the complete substantive guideline, not just its base offense level," and that "result is then plugged back into the base for money laundering."  United States v. Hodge, 558 F.3d 630, 637 (7th Cir. 2009).  Thus, in this case, the base level on the money laundering count would include applicable U.S.S.G. § 2B1.1 enhancements.  See United States v. Baretz, 411 F.3d 867, 876 (7th Cir. 2005).[1]  The court must then impose applicable enhancements under § 2S1.1(b), thus ensuring that "'all direct money launderers . . . receive an offense level that is one to four levels greater than the Chapter Two offense level for the underlying offense, depending on the statute of conviction and sophistication of the money

_____

[1]The U.S.S.G. § 3B1.1 enhancement would apply just once (technically, on the money laundering count), see U.S.S.G. § 2S1.1 cmt. n.2(C), to avoid double counting.  See United States v. Keck, 643 F.3d 789, 801 (10th Cir. 2011) (citing United States v. Arthur, No. 04–CR–122, 2006 WL 3857491, at *2 (E.D. Wis. Dec. 22, 2006)).

2

laundering offense conduct.'" Hodge, 558 F.3d at 637 (quoting Sentencing Guidelines Manual App. C (Vol. II) 223). The PSR in this case added 2 levels under U.S.S.G. § 2S1.1(b) because defendant was convicted under 18 U.S.C. § 1957. (PSR ¶ 73.) However, if the defendant was convicted under § 1957, the court adds 1 level under U.S.S.G. § 2S1.1(b)(2)(A).

At sentencing, the parties agreed with these observations. Therefore, I adopted a final offense level of 19: the level on the mail fraud count as indicated in the PSR, which was then plugged in as the base level on the money laundering count, with 1 level added based on the conviction under § 1957, and 3 levels subtracted for acceptance of responsibility. Coupled with defendant's undisputed criminal history category of II, level 19 produced an imprisonment range of 33 to 41 months.

## II.  SECTION 3553(a)

### A.    Sentencing Factors

After computing the guideline range, the court must determine the sentence on consideration of all of the factors set forth in 18 U.S.C. § 3553(a). See United States v. Harris, 490 F.3d 589, 593 (7th Cir. 2007). Those factors include:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the [advisory] sentencing [guideline] range[;]

(5) any pertinent policy statement . . . issued by the Sentencing Commission[;]

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a). The statute directs the court, after considering these factors, to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." Id.

While the guidelines serve as the starting point and initial benchmark in making this determination, Gall, 552 U.S. at 49, the district court may not presume that a guideline sentence is the correct one, Nelson v. United States, 129 S. Ct. 890, 892 (2009). Rather, the court must make an independent determination, without any thumb on the scale favoring a guideline sentence, United States v. Sachsenmaier, 491 F.3d 680, 685 (7th Cir. 2007), taking into account the types of sentences available, the relevant § 3553(a) factors, and the arguments of the parties, see Gall, 552 U.S. at 49-50.

**B.    Analysis**

    **1.    The Offense**

In late 2003, defendant founded a private school called "LEADER," and in 2004, he applied for and received permission for the school to participate in the Milwaukee school choice program. From early 2004 to October 2005, LEADER participated in the program, receiving $1.3 million in tuition payments. However, in late 2005 the state Department of Public Instruction ("DPI") determined that LEADER was overpaid about $130,000, ordered LEADER to repay that amount, and when it failed to do so dropped the school from the choice program.

In June of 2005, defendant on behalf of LEADER signed an agreement to participate

4

in the federal school lunch and breakfast programs, which permit participating schools to obtain cash reimbursement for providing nutritionally balanced food to eligible students. As set forth in ¶ 16 of the PSR, the program contains various eligibility provisions. In Wisconsin, schools make meal reimbursement claims through a DPI website using a password unique to that school. The DPI would in turn obtain federal funds from segregated accounts and then prepare a DPI check to reimburse the school for that month's submissions and mail those checks to the school. A LEADER employee named Elgin Hortman entered the data for the school's reimbursements from July to December 2005, after which, according to Hortman, defendant did it himself for the next five months. Defendant denied making those five submissions but admitted that he directed Hortman to do it. Regardless of who made them, these submissions added 200 additional students to the numbers Hortman submitted in November 2005.

On February 22, 2006, defendant received and deposited a $40,815 reimbursement check for January. According to bank records, within minutes he wrote a $13,000 check to cash and walked out of the bank with the money. That same day, Hortman sent his DPI contact an e-mail stating that LEADER's last day of operation was February 16, 2006. On February 23, 2006, defendant returned to the bank and withdrew $19,000, transferring $10,000 into his wife's account and purchasing $9000 in cashier's checks in his name, which he later deposited into a personal account at another bank. That same day, he sent an e-mail to the DPI stating that he had closed the school. However, defendant continued to make reimbursement submissions, which DPI continued to pay, after this date. A later investigation revealed that even though DPI received LEADER's e-mail notices, due to an administrative error LEADER's contract was not disabled until May 18, 2006.

The PSR on pages 7-9 summarized LEADER's bank activity from January to May 2006:

5

the school would receive monthly reimbursement checks of around $40,000, with defendant then obtaining the funds in various ways – writing checks to his wife, to cash, and to himself; withdrawing large amounts of cash, transferring some to his wife's account, using some to purchase cashier's checks, which he deposited into his personal account; and making cash withdrawals and credit card purchases for personal purposes using a card attached to the LEADER account. Some time in March 2006, defendant moved to Las Vegas, but he returned to Milwaukee to conduct financial transactions.[2]

During an August 6, 2007 interview with Department of Agriculture agents, defendant admitted that he used money from the food programs to pay LEADER's employees from October 2005 to March 2006 because the school was not getting paid by the DPI for tuition. He also claimed that Hortman prepared meals for 300 students, despite the fact that the school did not have a working stove. When shown banking records, he admitted that some of the withdrawals from LEADER's account were for personal expenses. He also admitted that he received payments for the food program after the school closed. He said he believed the school was entitled to receive food program funds through the end of the year if the DPI was still allowing the school to make the claims in their system and was sending them the checks. During a later interview, defendant stated that he believed he could use the money for any purpose whatsoever and admitted using the LEADER check card for personal expenses. The Food and Nutrition Service claimed $160,123.68 in restitution based on defendant's fraud.

In his statement to the PSR writer, defendant expressed regret for committing the

---

[2]The § 1957 money laundering count arose out of a March 20, 2006, monetary transaction in which defendant issued a check in the amount of $18,007, payable to Henry Tyler and drawn on LEADER's bank account, and funded by the proceeds of defendant's scheme to defraud.

offense.  He stated that as a result he lost everything.  He said that he did it because of financial problems at the school.

### 2.    The Defendant

Defendant was thirty-nine years old, with some prior record, including for fraudulent conduct, although nothing so serious as the instant offense – issuance of worthless checks in 1994, theft by fraud in 1994, criminal damage to property in 1996, operating after revocation ("OAR") in 1999, and worthless checks again in 2002 arising out of his depositing counterfeit checks.  He generally received probation on these cases; aside from 30 days jail on the OAR, he had not served time before.

In looking further at his background, I noted the problems in defendant's childhood. Although he was raised in a two-parent home, his father abused alcohol and drugs, was abusive, and came and went as he wanted.  Defendant nevertheless managed to graduate high school and college, served in the Marines, and worked as a teacher before opening his own school.[3]  He obtained a master's degree in education in 2008 and was at the time of sentencing working on his doctorate.  According to statements in the PSR, he had a positive impact on the students with whom he worked.  The court also received numerous positive reference letters.

Defendant had been married three times and had a total of thirteen children.  His current wife, with whom he had four kids, ages nine, five, four, and two, made positive statements about him and remained supportive.  Defendant suffered from mental health issues, as discussed in ¶¶ 114-118 of the PSR.  He complied with pre-trial release conditions in this case.

---

[3]The government accepted that defendant started LEADER in good faith.

### 3.    The Sentence

The guidelines recommended 33-41 months in this case, and I agreed that a period of imprisonment was needed to provide just punishment, promote respect for the law, and deter defendant and others.  This was a serious offense: defendant took advantage of a program designed to assist needy students, improperly obtaining a substantial amount of money.  Whatever financial problems the school had provided no excuse; defendant continued this conduct even after the school closed, and he used much of the money for purely personal purposes.  There was also a need for prison to deter others tempted to take advantage of these programs.  I further considered the fact that defendant previously had brushes with the law, including for financial or fraud-related offenses, yet continued to offend.

I did find that a term somewhat below the guideline range would suffice.  First, under the circumstances of this case, the enhancements under §§ 3B1.1 and 2B1.1(b)(8)(A) did not add all that much.  LEADER started as a legitimate educational enterprise, and it appeared that Hortman, an employee of the school, shared proceeds.[4]

Second, aside from a short jail stint on the OAR, defendant had never served time before.  Generally speaking, a lesser sentence will suffice to deter a defendant not previously subject to lengthy incarceration than is necessary to deter a defendant who has already served serious time yet continues to re-offend.  See United States v. Qualls, 373 F. Supp. 2d 873, 877 (E.D. Wis. 2005).

---

[4]Defendant argued that criminal history category II overstated his record, noting the age of his three scored sentences and his ability to complete previous terms of probation.  However, defendant had two other, un-scored convictions.  He could not reasonably be treated as a category I offender.  Further, as discussed above, given the failure to previous sentences served in the community to correct defendant's behavior, I found a period of imprisonment necessary to deter at this point.

Third, as the government acknowledged, defendant had some significant positives in his background – completing his education, working as a teacher, serving in the military – that deserved consideration. It appeared that he had a positive influence on many students. He also enjoyed strong family support and appeared to be taking steps to address his mental health treatment needs.

## III. CONCLUSION

Under all the circumstances, I found a sentence of 18 months sufficient but not greater than necessary to satisfy the purposes of sentencing. Therefore, for the reasons stated herein and on the record, I committed defendant to the custody of the Bureau of Prisons for 18 months on each count concurrent. This sentence was based on § 3553(a) and would have been the same regardless of the guideline calculations. Based on his financial situation and the restitution obligation, I determined that defendant lacked the ability to pay a fine and so waived the fine. I ordered him to make restitution in the amount of $160,123.68 to the Food and Nutrition Service. Upon release, I ordered him to serve supervised release terms of 3 years on each count concurrent. I selected the maximum term of supervision to ensure monitoring, treatment, and payment of restitution. As conditions, I required him to pay restitution at a rate of not less than $100 per month, provide access to financial information, and participate in a mental health treatment program. Other terms and conditions of the sentence appear in the judgment.

Dated at Milwaukee, Wisconsin, this 15th day of August, 2011.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge